# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

WILLY KIWEWA,
    Plaintiff,

vs.

MEGAN BRENNAN,
POSTMASTER GENERAL,
UNITED STATES POSTAL SERVICE,
    Defendant.

Case No. 1:15-cv-815
Litkovitz, M.J.

**ORDER**

    Plaintiff Willy Kiwewa, proceeding *pro se*, brings this action against defendant Megan Brennan, Postmaster General, United States Postal Service (USPS), alleging discrimination on account of his national origin in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*. (Title VII).[1] This matter is before the Court on defendant's motion for summary judgment under Fed. R. Civ. P. 56 (Doc. 52) and plaintiff's memorandum in opposition to the motion (Doc. 64); plaintiff's motion for partial summary judgment (Doc. 55) and defendant's response in opposition to the motion (Doc. 56); plaintiff's "Request for Affidavit" (Doc. 57); plaintiff's motion to amend/correct motion for partial summary judgment (Doc. 58), which is unopposed; and plaintiff's amended motion for partial summary judgment (Doc. 59).

## I. Background

    Plaintiff, a native of the Democratic Republic of Congo, filed the original complaint in this action on December 23, 2015, alleging discrimination on the basis of his national origin and seeking compensatory damages, unpaid wages, backpay, and other relief. (Doc. 1). Plaintiff

---

[1] Plaintiff also alleges that the Court has jurisdiction under 42 U.S.C. § 1983, but he has not presented a claim under the statute.

filed an amended verified complaint on September 30, 2016. (Doc. 27).[2] Plaintiff alleges

defendant USPS discriminated against him on account of his national origin in violation of Title

VII and § 1983 when it terminated him during his probationary employment period and failed to

pay him wages he was owed for 40 hours of work. Plaintiff alleges that he was terminated on

December 24, 2013, after he had completed 35 days of his new employee probationary period.

(*Id.* at 1). Plaintiff contends that he was performing his job to his employer's expectations on the

date of his termination and that the agency hired Nicole Shiner and Terry "Reunion" [Runion] as

City Carrier Assistants (CCAs) after him to do his job. (*Id.* at 3).

Plaintiff further asserts in the complaint that the USPS has not articulated a legitimate

reason for its employment decision and there is evidence the USPS's true reason for its action

was his national origin. (*Id.*). Plaintiff alleges that the USPS deviated from its standard

procedures by failing to conduct a formal evaluation and to document the evaluation on PS

(Postal Service) Form 1750; it did not use objective criteria to determine if individuals in his

position were qualified or unqualified; and it did not timely mention the reason for his

termination in accordance with its procedures when it had the opportunity to investigate or to

provide any pertinent information to the investigator during the administrative appeal. (*Id.* at 4,

8). Plaintiff also contends that a proper investigation was not conducted into the allegation of a

supervisor, Rick Pieper, that plaintiff refused to deliver an unsorted parcel. (*Id.* at 5). Plaintiff

further alleges that the USPS engaged in suspicious conduct by changing the reason for his

discharge from a termination to a voluntary resignation on PS Form 50: Notification of Personnel

---

[2] Plaintiff's amended verified complaint signed under penalty of perjury pursuant to 28 U.S.C. § 1746 has the same force and effect as an affidavit for purposes of responding to defendant's motion for summary judgment. *El Bey v. Roop*, 530 F.3d 407, 414 (6th Cir. 2008) (citing *Lavado v. Keohane*, 992 F.2d 601, 605 (6th Cir. 1993); *Williams v. Browman*, 981 F.2d 901, 905 (6th Cir. 1992)).

Action and by deleting part of the form related to his reason for separation from the form sent to him. (*Id.* at 7). Plaintiff further asserts that he was not correctly paid for several days that he worked and the USPS admits he worked on one of those dates for which he was not paid (December 22, 2013), and his supervisor did not input his hours worked on that date in the USPS time and attendance system. (*Id.* at 6-7, 8). Plaintiff alleges that other CCAs who worked on that date were correctly paid. (*Id.* at 6-7). Plaintiff contends that because the USPS has admitted his supervisor did not input his hours, any explanations related to a system problem are "insincere," and in turn the agency's stated reason for his termination is not true.[3] Plaintiff also alleges that a manager who had input into the termination decision, Thomas Stacy, made derogatory remarks about him indicating additional workers or time were required to assist plaintiff and that he had a "cultural gap" in writing and speaking. (*Id.* at 6).

## II. "Request for Affidavit" (Doc. 57) and Motion to amend plaintiff's motion for partial summary judgment (Doc. 58)

In his "Request for Affidavit," plaintiff moves the Court for "a copy of affidavit or sworn testimony in support of the Plaintiff's assertion of the fact in regards of Defendant's declaration. *See* Document attached." (Doc. 57). Plaintiff has attached the Declaration of Rochelle Evans to the motion. Plaintiff seeks relief under Fed. R. Civ. P. 56(e)(1), (2), which states:

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:
>
> (1) give an opportunity to properly support or address the fact;
>
> (2) consider the fact undisputed for purposes of the motion[.]

---

[3] The Court noted in an earlier opinion issued in this case that although plaintiff indicated in a memorandum that he was bringing a claim under the Equal Pay Act (EPA), 29 U.S.C. § 206(d), the Court would not address a possible EPA claim because plaintiff had not raised a claim under the Act in the complaint. (Doc. 13 at 8, n.1).

Fed. R. Civ. P. 56. It is not clear from plaintiff's motion what specific relief plaintiff seeks. Without knowing the nature of plaintiff's request, the Court cannot determine whether plaintiff is entitled to relief under Rule 56(e)(1) or (2). The "Request for Affidavit" is therefore denied.

Plaintiff has also filed a motion to amend his motion for summary judgment to correct technical filing errors regarding transcripts and exhibits. (Doc. 58). The motion is unopposed and is granted.

## III. Motions for summary judgment

### A. Defendant's motion for summary judgment

Defendant moves for summary judgment under Fed. R. Civ. P. 56 on plaintiff's claims of discrimination based on his national origin, which defendant asserts are based on the following issues which were presented to and investigated by the Equal Employment Opportunity Commission (EEOC): (1) plaintiff was terminated from his employment during the probationary period on December 24, 2013; (2) plaintiff was not paid appropriately but subsequently received a money order for the hours worked without deductions taken out; (3) the PS Form 50, Notification of Personnel Action, issued in connection with plaintiff's discharge inaccurately indicates that plaintiff voluntarily resigned effective February 20, 2014; and (4) as of June 19, 2014, plaintiff had not been paid accumulated leave to which he was entitled. (Doc. 52 at 2, citing Doc. 27, Amended Complaint, at 1, 3-4, 6-8; *See id.*, Exh. 1, "Acknowledgement/ Acceptance of Amendment to EEO [Equal Employment Opportunity] Complaint." Defendant argues that there is no genuine issue of material fact on plaintiff's claims and it is entitled to judgment as a matter of law. Defendant alleges that plaintiff has produced no direct evidence of discrimination and he has not proffered circumstantial evidence sufficient to establish his claims. Specifically, defendant contends that plaintiff has not identified any comparable employees and

several of the issues he has raised are "demonstrably false." (Doc. 52 at 2). Defendant further argues that it has articulated legitimate, nondiscriminatory reasons for its actions which plaintiff cannot show to be pretextual.

## B. Plaintiff's motion for summary judgment

Plaintiff moves the Court for summary judgment on his claims on several grounds.[4] (Doc. 59). First, plaintiff alleges that his manager at the Sharonville Branch where plaintiff worked on several dates, Thomas Stacy, made "stray remarks" and contradictory remarks about plaintiff's job performance, including a remark about a "cultural gap," and issues with timeliness. (*Id*. at 2-3). Plaintiff alleges that although he disagreed with both of his managers' assessments of his performance, he followed the advice they gave so he could improve. (*Id*. at 3). Second, plaintiff alleges that a change of reason for his discharge from a termination to a voluntary resignation on a PS Form 50, Notification of Personnel Action, is not the result of a miscommunication or a clerical error involving his Social Security number as defendant asserts but instead is evidence that defendant acted with an improper motive. (*Id*. at 3). Third, plaintiff argues that defendant improperly relies on managers' statements which were largely written after his termination but were not submitted during the administrative appeal process, and which raise issues of credibility and leave a number of questions unanswered. (*Id*. at 4). Finally, plaintiff alleges that defendant gave him a check for 40 hours of unpaid work, but there are unexplained discrepancies between the deductions shown on the check and his 2016 W2 statement. (*Id*. at 5). Plaintiff alleges that he has not received a response to inquiries asking for an explanation of the discrepancies, so that this dispute remains unresolved. (*Id*.).

---

[4] Although plaintiff has captioned his motion as a motion for "partial summary judgment," he appears to move for summary judgment on all claims.

Plaintiff argues that he can establish a prima facie case of discrimination because (1) he is a member of a protected class by virtue of his national origin, (2) he was performing his job to his employer's expectations, (3) he suffered an adverse employment action, and (4) the USPS sought and hired two individuals to replace him, Nicole Shiner and Terry Reunion [Runion]. (*Id.* at 7). Plaintiff alleges that defendant's alleged reasons for his termination - delivery time problems, the need to enlist additional people to assist him in completing his routes, and failure to follow supervisors' instructions regarding delivering parcels and returning to the office at specific times to retrieve additional parcels - are a pretext for discrimination. (*Id.* at 7-8, 10-11). Plaintiff alleges that the employer's expectations were applied in a disparate manner. (*Id.* at 8). Plaintiff indicates that although he required the assistance of fellow CCAs, he also assisted other CCAs. (*Id.* at 7). Plaintiff further alleges that defendant did not conduct an evaluation after 30 days and complete a PS Form 1750 as it was required to do. (*Id.* at 8). He also contends that the evidence is not consistent with defendant's allegations of errors in the Notification of Personnel forms. (*Id.* at 9). Finally, plaintiff alleges that managers and supervisors' statements produced by defendant raise triable credibility issues when compared to his affidavit and deposition. (*Id.* at 10-11).

### C. Rule 56 standard

A motion for summary judgment should be granted if the evidence submitted to the court demonstrates that there is no genuine issue as to any material fact and that the movant is entitled to summary judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "[A] party seeking summary judgment . . . bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, it any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323. *See also Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 405 (6th Cir. 1982). The movant may do so by identifying that the non-moving party lacks evidence to support an essential element of its case. *See Barnhart v. Pickrel, Shaeffer & Ebeling Co. L.P.A.*, 12 F.3d 1382, 1389 (6th Cir. 1993).

Evidence in the record is viewed in the light most favorable to the nonmoving party, with all reasonable inferences drawn to that party's benefit. *Combs v. Int'l Ins. Co.,* 354 F.3d 568, 576-77 (6th Cir. 2004) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970)). Summary judgment is appropriate only where the evidence raises no genuine issues of material fact "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

The party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253 (1968)). In response to a properly supported summary judgment motion, the non-moving party "is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial." *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987) (quoting *First Nat'l Bank of Arizona*, 391 U.S. at 288-89).

### D. Statutory Framework

Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . national origin." *Johnson v. Metro.*

*Govt. of Nashville and Davidson County, Tenn.*, 502 F. App'x 523, 534 (6th Cir. 2012). A plaintiff can prove employment discrimination through either direct evidence or circumstantial evidence. Direct evidence is "evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Johnson*, 502 F. App'x at 534 (citations omitted). "Direct evidence must prove not only discriminatory animus, but also that the employer actually acted on that animus." *Id.* (citing *Amini v. Oberlin College*, 440 F.3d 350, 359 (6th Cir. 2006)).

Where a plaintiff seeks to prove his Title VII claim through circumstantial evidence, the claim is analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *DeNoma v. Hamilton County Ct. of Com. Pleas*, 626 F. App'x 101, 104-05 (6th Cir. 2015) (citing *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 347 (6th Cir. 2012) (citing *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009)). Plaintiff must first establish a prima facie case of national origin discrimination; the burden then shifts to the employer to articulate a legitimate, non-discriminatory explanation for its actions; and then the burden shifts back to the plaintiff to show pretext. *Id.* (quoting *Chen*, 580 F.3d at 400).

To establish a *prima facie* case of national origin discrimination under Title VII, plaintiff must show that: (1) he is a member of a protected class; (2) he suffered an adverse employment action; (3) he was qualified for the position in question; and (4) he was replaced by someone outside the protected class. *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 654-55 (6th Cir. 2015) (citing *Griffin v. Finkbeiner*, 689 F.3d 584, 592 (6th Cir. 2012)). Plaintiff can also establish the fourth prong by showing "that a similarly situated employee outside the protected class . . . was treated more favorably than [plaintiff]." *Id.* at 655.

To be considered "similarly situated" for purposes of the fourth prong of the prima facie case, the employment situation of the comparator and plaintiff must be similar "in all relevant aspects." *Romans v. Michigan Dept. of Human Services*, 668 F.3d 826, 837-38 (6th Cir. 2012) (quoting *Highfill v. City of Memphis,* 425 F. App'x 470, 474 (6th Cir. 2011)). In the disciplinary context, plaintiff must also show that the employees with whom he seeks to compare himself "engaged in acts of comparable seriousness." *Martinez v. Cracker Barrel Old Country Store, Inc.,* 703 F.3d 911, 917 (6th Cir. 2013). In making this assessment, the Court must consider factors such as whether plaintiff and the alleged comparators "have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Id.* (citation and internal quotations omitted).

### E. Facts

Plaintiff began his employment with the USPS on November 2, 2013, as a CCA. (Doc. 52, Exh. 2, PS Form 50, Notification of Personnel Action). After he finished CCA training, plaintiff began working as a CCA on November 21, 2013 at the USPS Parkdale Branch under the supervision of Rochelle Evans, Manager, Customer Services at the Parkdale Branch. (*Id.*, Exh. 3, Evans Decl., ¶¶ 1, 3). Evans continued to supervise plaintiff until he was discharged from the USPS on December 24, 2013, after a total of 30 days of work. (*Id.*, ¶ 3). Plaintiff also worked at the Sharonville Branch on four dates, where he was supervised by Thomas Stacy, the Sharonville Branch's Manager of Customer Services. (*Id.*, Exh. 6, Stacy Decl., ¶ 3).

A CCA is a temporary employee whose job duties generally include delivering and collecting mail on foot or by vehicle in a prescribed area and maintaining professional and effective public relations with customers and others; demonstrating proficiency in sorting and

9

delivering mail in sequence of delivery along an established route when assigned to a route; and

picking up additional mail as needed and collecting mail from street letter boxes and from

customers. (*Id.*, Exh. 3, Evans Decl., ¶¶ 3, 4). The CCA position requires general familiarity

with postal laws, regulations, products, commonly used procedures, and the geography of the

area. (*Id.*, ¶ 4).

Under Article 12 of Handbook EL-901, 2011-2016 National Agreement between the

National Association of Letter Carriers and the USPS, CCAs like plaintiff were subject to a 90-

day probationary period. (*Id.*, ¶ 5). Article 12, Section 1(A) provides in part: "The Employer

shall have the right to separate from its employ any probationary employee at any time during

the probationary period and these probationary employees shall not be permitted access to the

grievance procedure in relation thereto." (*Id.*). Probationary employees receive written

evaluations after 30, 60 and 80 days of work. (Doc. 59-1 at Page ID#: 1033, Handbook EL 312,

Employment and Protection, § 584.52).

Defendant alleges that during his probationary period of employment, plaintiff

experienced performance issues and failed to follow his direct supervisors' orders, which led to

his termination. (Doc. 52 at 3, citing Exh. 4, Notice of Separation; Evans EEO Aff., Exh. 5, ¶ 5[5];

Evans Decl., Exh. 3, ¶¶ 6-8). In her EEO affidavit dated July 24, 2014, Evans states that she

made the decision to terminate plaintiff and he was terminated during probation because he "had

continued performance issues, and the supervisors had to give him direct orders after repeatedly

asking him to perform different duties, that he stated he wasn't going to do." (Doc. 52, Exh. 5,

Evans EEO Aff., ¶ 5). Evans asserts in the declaration she gave for this lawsuit that she

"invested a significant amount of time trying to assist [plaintiff] in improving his street delivery

---

[5] Evans submitted this affidavit during the Equal Employment Opportunity (EEO) administrative proceedings.

times by putting him on the same routes in hopes that he would begin to complete his duties more efficiently," but plaintiff "demonstrated no improvement in his street delivery times or in his familiarity with the geography of the area." (Doc. 52, Exh. 3, Evans Decl., ¶ 6). She also states that plaintiff "disregarded supervisors' direct instructions when he refused to deliver parcels on several occasions when assigned by Manager Thomas Stacy, Supervisor Joshua Witt, and Supervisor Douglas 'Rick' Pieper." (*Id.*, Exh. 3, Evans Decl., ¶ 7, citing Exh. 12-Stacy emails dated 12/13/13 and 12/27/17, Exh. 14-Witt statement, Exh. 15-Pieper statement). Evans asserts that based on plaintiff's "continued performance issues, and failure to demonstrate improvement, I made the decision to issue him a Notice of Separation on December 24, 2013, as [plaintiff's] inability to perform the essential functions of his position in a timely manner and his refusal to follow supervisors' direct instructions disrupted the daily operations of the Post Office." (*Id.*, ¶ 8).

Evans cites two emails authored by Stacy in her declaration. (Doc. 52, Exh. 12). Stacy sent the first email on December 13, 2013 to Mark Bonavita and copied Elmer Schmalle. (*Id.*). The email reads in full as follows:

> Mr Kiwewa - today again had many issues - I spent about 30 minutes with him and trying to help him and assist in helping him improve his time.
>
> Then Elmer went out behind me and made the same effort - Mr Kiwewa doesn't seem to be grasping it.
>
> We will clear shortly and I'll update.

(*Id.*). The second email was sent by Stacy to Evans on December 27, 2013 and reads:

> Mr. Kiwewa was observed delivering parcels - 12-13-2013 - after being here just 2 days prior, thought it prudent we spend more time with him.
>
> After 20 minutes of not delivering mail, I stopped Mr. Kiwewa and inquired as to what he was doing, he advised he had parcels that were "not on his route" that day

(and they indeed were on the route), and Mr. Kiwewa was more interested in showing me "where" he delivered the "bad" parcel, he was unaware that I had been observing him. The point that was explained was that if he didn't start concentrating on delivering mail, he would never finish - and that his task that day was no greater than anyone else's and the expectation was that he complete it in an acceptable time - clear expectations were placed before him with a "you're leaving at, you should expect to be finished at xxxx." There was an inability to place focus on delivering the mail at hand, but more as to perceived obstacles of the day. Scan points with time expectations were also provided, but in the conversations with Mr. Kiwewa, though their importance explained, were not grasped by the employee.

Both days the employee worked here - though provisions made - found that it took four additional employees on both days to complete a little over five hours work, the employee - Mr. Kiwewa had completed a little over one hours worth of work after being on the clock some seven hours plus.

Mr. Kiwewa also notated that he had no knowledge of how to use an arrow key in delivery, to which consultation with Rochelle Evens [sic] contested he had been shown how to use in the performance of delivering. Though a very seeming compassionate employee, not grasping the necessity of timeliness and focus of being a letter carrier.

(*Id.*).

Exhibit 14 is a statement signed by Witt on December 30, 2013. (Doc. 52, Exh. 14). The statement recounts an incident that occurred on December 23, 2013. Witt states that he was "running the floor" and instructed plaintiff to deliver a route in the morning that requires 1.5 hours of delivery and return to the office to retrieve parcels. Plaintiff said "okay" but called Witt's cell phone around noon and told Witt he had finished his route and was not going to return to the office but was going on to his next route. Witt told plaintiff to return to the office as he had been instructed earlier that morning to get the parcels. Plaintiff repeated that he was going to go on to his next route as he was already out there. Witt instructed him "for the third time" to return to the office before going anywhere else, at which point plaintiff said "ok."

Exhibit 15 is an undated statement by Pieper. (Doc. 52, Exh. 15). Pieper states that on Sunday, December 22, plaintiff called at approximately 3:28 to inform Pieper he had two parcels that were not on his manifest. When asked if he could find the delivery location of each parcel, plaintiff said he could with his phone's GPS. Plaintiff was instructed to deliver both parcels and then return to the office. When a call was placed to plaintiff around 4:20 to check on his progress, plaintiff stated he was about one minute from the office and he had not delivered one parcel because it was "too far away." After Pieper completed his duties for the day, he delivered the parcel himself.

Defendant alleges that plaintiff worked for Stacy at the Sharonville Branch on four occasions and plaintiff experienced "similar difficulty in efficiently completing his assigned duties and following supervisors' instructions." (Doc. 52 at 3, citing Exh. 6, Stacy Decl., ¶¶ 4-6). Stacy states in his affidavit that plaintiff was loaned to the Sharonville Branch four times during his tenure with the USPS. (Exh. 6, ¶ 3). Stacy asserts that each time plaintiff worked there, Stacy "invested a significant amount of time in trying to assist him in improving his street delivery times" by assigning him to the same routes, observing him while he was delivering mail on the street, and trying to demonstrate proper procedures for him and communicating clear expectations for how to complete his duties. (*Id.*, ¶ 4). Stacy states that despite these efforts, plaintiff demonstrated no progress or improvement in completing his duties. (*Id.*). Stacy asserts that each time plaintiff reported to work at the Sharonville Branch, he experienced significant performance issues which disrupted the branch's ability to ensure efficient service to its customers. (*Id.*, ¶ 6). Stacy gives as an example a work day when plaintiff should have been able to complete his work in a matter of hours but was on the clock for seven hours and completed approximately one hour's worth of work. (*Id.*, ¶ 5). Stacy asserts he had to send

additional employees to complete plaintiff's work each day plaintiff worked at the branch, even though he should have been able to complete his work in a matter of hours. (*Id*.).

Defendant has submitted the EEO Dispute Resolution Specialist's (DRS) Inquiry Report dated May 8, 2014, in support of its motion. (Doc. 52, Exh. 9). The Report notes that according to plaintiff, Evans informed him that he was terminated and that "his work performance was poor because he was too slow," which plaintiff alleged was based on false allegations. (*Id*. at 3). Plaintiff acknowledged to the DRS that Evans gave him a termination letter notifying him that he was terminated "due to continued performance issues and his 'Failure to follow Postal Service Rules and Regulations.'" (*Id*. at 3-4). Stacy provided a statement as part of the inquiry on March 20, 2014. (*Id*. at 4). He informed the DRS that plaintiff was assigned to the Sharonville office on two occasions. Stacy asserted that he told his supervisor "I can't afford 15 hours on a route" because both times plaintiff worked at his office he had to send out four to five employees to finish delivering plaintiff's route and give each of them at least one hour of additional time. (*Id*. at 4). He denied ever saying, "How can I have a guy who is going to cost me 15 workers for help," as plaintiff alleged. (*Id*.). The DRS concluded in the report: "Manager Stacy states that he believes [plaintiff] tried to perform his duties to the best of his ability; however, he was slow and it appears to be a cultural gap as well as written and verbal barriers for the Counselee." (*Id*.).

Plaintiff denies in his response to the summary judgment motion that he refused to follow his supervisors' direct instruction on several occasions, and he asserts that he does not believe his delivery times were an issue. (Doc. 64 at 4). Plaintiff alleges that he followed his managers' guidance by getting a GPS system and by redoing his route daily and he followed certain USPS policies. (*Id*.). Plaintiff alleges that he experienced disparate treatment in job assignments and wage payments, and he was subjected to conflicting instructions, discriminatory comments about

14

a cultural gap and job performance based on defendant's subjective expectations, and false accusations that he resigned instead of being terminated. (*Id.*, citing Doc. 64-2, Plaintiff's Aff., ¶¶ a-o).

## F. Defendant is entitled to summary judgment

The Court has considered defendant's motion for summary judgment (Doc. 52), plaintiff's motion for summary judgment as amended (Doc. 59), each party's response to the opposing party's motion (Docs. 56, 64), and the evidence each side has submitted in support of their motions and responses.[6] Defendant has established that there are no genuine issues of material fact and that it is entitled to summary judgment as a matter of law. The Court will therefore grant defendant's motion and issue judgment in its favor.

### 1. Direct evidence of discrimination

Defendant argues that plaintiff has not presented any direct evidence that he was terminated because of his national origin. Defendant contends that the only evidence plaintiff has offered as "direct evidence" of discrimination is a comment reported in the EEO investigator's report issued several months after plaintiff's termination. In the report, the investigator summarized statements made by Stacy as follows: "Manager Stacy states that he believes [plaintiff] tried to perform his duties to the best of his ability; however, he was slow and it appears to be a cultural gap as well as written and verbal barriers for the [plaintiff]." (Doc. 52 at 7, citing Exh. 9). Defendant argues that the reference to a "cultural gap" in the DRS Inquiry Report is not direct evidence of discrimination because it is vague, "not overtly discriminatory in nature," and not attributable to a decision-maker. (*Id.*, citing *Chambers v. City of Cincinnati*, No.

---

[6] Defendant relies on its summary judgment motion as its response to plaintiff's motion for summary judgment. (Doc. 56).

1:14-cv-263, 2015 WL 881179, at *6 (S.D. Ohio Mar. 2, 2015) (citing *Tepper v. Potter,* 505 F.3d 508, 516 (6th Cir. 2007)). Defendant further argues that this evidence does not compel the conclusion that plaintiff's termination was motivated by discrimination and instead requires the factfinder to draw multiple inferences to find that the statement is probative of discriminatory intent; therefore, the statement is at best circumstantial evidence of discrimination. (*Id.* at 6-10, citing *Johnson,* 319 F.3d at 865; *Romans,* 668 F.3d at 836)

The Court agrees that any comments Stacy reportedly made during the EEO interview are not direct evidence of discrimination. Initially, the DRS did not indicate that she was quoting Stacy verbatim, so it is not clear whether Stacy actually used the phrase "cultural gap." (Doc. 52, Exh. 9 at 4). Assuming Stacy used the phrase, his comment nonetheless is not "overtly discriminatory in nature." *See Chambers,* 2015 WL 881179, at *6. It is not a disparaging comment about plaintiff's national origin, and it does not show on its face that Stacy harbored an animus against plaintiff based on his national origin. In addition, Stacy gave Evans feedback on plaintiff's job performance, but he was not the decision-maker in plaintiff's case. Evans states in her affidavit and declaration that she made the termination decision, and there is no evidence that contradicts her statement. (Doc. 52, Exh. 5, Evans EEO Aff., ¶ 5; Exh. 3, Evans Decl., ¶ 8). Nor is there any evidence that the comment, which postdates plaintiff's discharge by several months, had ever been made by Stacy or relayed to Evans prior to plaintiff's discharge. Stacy participated in the EEO inquiry in March 2014, nearly three months after plaintiff was terminated.[7] (*See* Doc. 52, Exh. 9 at 4). The "cultural gap" remark therefore is remote in time from plaintiff's termination and could not have been communicated to Evans before plaintiff was

---

[7] Defendant indicates that Stacy's EEO interview was in May 2014. (Doc. 52 at 9). Although the DRS Inquiry Report is dated May 8, 2014, the report states that a management inquiry with Stacy was conducted on March 20, 2014. (Doc. 52, Exh. 9 at 4).

discharged. In light of the undisputed evidence that Evans was the ultimate decision-maker in plaintiff's case, the vague nature of the comments in the DRS report, and the timing of those comments, the reference to a "cultural gap" that may have contributed to plaintiff's performance issues does not compel the conclusion that plaintiff's national origin was at least a motivating factor in defendant's decision to terminate his employment during the probationary period. The comments therefore are not direct evidence of discrimination. Plaintiff has not proffered any other evidence that could potentially be construed as direct evidence of discrimination.

### 2. Circumstantial evidence of discrimination

### a. Prima facie case

Defendant argues that plaintiff cannot establish that his termination was discriminatory based on circumstantial evidence. Initially, defendant contends that plaintiff cannot establish a prima facie case of discrimination. Defendant does not dispute that plaintiff has satisfied the first three prongs of a prima facie case: (1) he is a member of a protected class (a native of the Democratic Republic of Congo); (2) he suffered an adverse employment action; and (3) he was qualified for the CCA position. However, defendant alleges that plaintiff has not produced evidence to satisfy the fourth prong of his prima facie case. Specifically, defendant alleges that plaintiff has not identified individuals outside the protected class who engaged in acts of comparable seriousness and who were treated more favorably than plaintiff.

Defendant argues that the ten individuals plaintiff has identified as potential comparators in the amended complaint and discovery requests are not similarly situated to plaintiff as required to establish the fourth prong of a prima facie case. (Doc. 52 at 12). In the amended complaint, plaintiff indicated that potential comparators were several CCAs who "had been assisted" but were not terminated. He identified these individuals as Jeron Ziegler, Jareck West,

Danny Bell, Dalton Grubbs and Cedreci Copeland. (Doc. 27, Amended Complaint, at 4-5). In his discovery requests, plaintiff indicated that other potential comparators were Jamaya Armstrong, J. Harris, D. Sparks, J. Bingham and S. Blue. (Doc. 52, Exh. 13, Plaintiff's Request for Discovery, 2nd Interrogatory). Defendant alleges that although plaintiff suggests these individuals are comparable to him because they had "been assisted," plaintiff was not terminated for this reason; instead, defendant alleges that plaintiff was discharged for his repeated failure to improve on his delivery times and for refusing to follow his supervisors' direct instructions. (*Id.* at 12, citing Exh. 5, Evans EEO Aff., ¶¶ 6, 7; Exh. 6, Stacy Decl., ¶¶ 4-6; Exh. 12, Stacy emails; Exh. 14, Witt statement; Exh. 15, Pieper statement). As such, defendant alleges plaintiff and the other CCAs he previously identified are not similarly situated.

Plaintiff has not come forward with evidence in response to defendant's motion for summary judgment to show that he was treated less favorably than similarly situated individuals. In his response, plaintiff has not attempted to compare himself to any of the CCAs named in the amended complaint or identified in his discovery requests. To the contrary, plaintiff concedes that he cannot show that other CCAs who were not terminated were similarly situated to him. (Doc. 64 at 8-9). Plaintiff asserts that he worked in different stations (Sharonville and Parkdale), under different supervisors, on different streets, at different starting times, and with different volumes assigned. Plaintiff acknowledges that he cannot determine other CCAs' starting times, volume of mail, and assigned routes. (*Id.* at 9). Plaintiff states that "in absence of objective criteria," he cannot "identify how others CCA were performing on the street." (*Id.*). Because plaintiff concedes he cannot show that any other CCA outside the protected class was comparable to him and that the CCA was treated more favorably than plaintiff, he has not

satisfied the fourth prong of a prima facie case by showing he was treated less favorably than a similarly situated individual outside the protected class.

Plaintiff alleges that he nonetheless can establish the fourth prong of his prima facie case by showing he was replaced by an individual outside the protected class. (Doc. 64 at 12). Plaintiff names two individuals who allegedly replaced him: Nicole Shiner and Terry Runion. (*Id.*, citing Doc. 59-1 at Page ID#: 1061-1062; *see also* Doc. 27, Amended Complaint, at 3, citing Doc. 12, Page ID#: 316-17). Plaintiff alleges in the amended complaint that the USPS "sought another CCA to do [] my job. The agency hired others CCA after me. Mr. Reunion [Runion] and Ms. Shiner." (Doc. 27 at 3, citing Doc. 12 at Page ID#: 316-317). The documents plaintiff cites to support his allegations are "Notification of Personnel Action" forms for Terry Runion and Nicole Shiner. The form for Runion shows a duty entry date of April 8, 2014 in the position of "City Carrier Assistant 2." (Doc. 59-1 at Page ID#: 1061). His duty station is listed as the Mt. Healthy Branch. (*Id.*). The form for Shiner shows a duty entry date of July 12, 2014 in the position of "City Carrier Assistant 1." (*Id.* at Page ID#: 1062). Her duty station is listed as the Westwood Branch. (*Id.*).

The evidence plaintiff has proffered does not show that he was replaced by an individual outside the protected class. Plaintiff has introduced evidence to show that other CCAs were hired after he was terminated. However, plaintiff has shown no connection between his termination and the hiring of these individuals. Whereas plaintiff was assigned to the Parkdale Branch and occasionally loaned to the Sharonville Branch, Runion and Shiner were assigned to different duty stations. Moreover, Runion was hired more than four months after plaintiff was terminated and Shiner was hired more than seven months later. The evidence plaintiff has produced therefore does not demonstrate or permit an inference that these CCAs were hired to

replace plaintiff. Plaintiff has failed to show that he was replaced by an individual outside the protected class.

Thus, construing the evidence and all reasonable inferences to be drawn from the evidence in plaintiff's favor, the Court finds there are no genuine factual issues as to whether plaintiff can establish the fourth prong of his prima facie case of discrimination. Plaintiff has not introduced evidence to show he was treated less favorably than similarly-situated individuals outside the protected class or that he was replaced by an individual outside the protected class. Because he is unable to establish a prima facie case of discrimination, plaintiff cannot prevail on his discrimination claims brought in this lawsuit.

### b. Defendant's articulated legitimate, nondiscriminatory reasons

Assuming for summary judgment purposes that plaintiff can establish a prima facie case of discrimination, defendant has articulated legitimate, nondiscriminatory reasons for plaintiff's termination. Defendant alleges plaintiff was terminated because of "his documented performance issues, including slow delivery times and failure to follow Agency policies. . . ." (Doc. 52 at 13). Defendant alleges that plaintiff testified about his perceived performance deficiencies at his deposition (Doc. 52 at 13-14, citing Exh. 7, Pltf. Depo. at 19:14-21, 49:1-5); he acknowledged that management "utilizes objective criteria" to evaluate carriers' performance on their routes (*Id.*, citing Exh. 7, Pltf. Depo. at 62:23-63:6); plaintiff gave testimony consistent with supervisors' assertions that they put him on the same routes so that he could improve his delivery times (*Id.* at 14, citing Exh. 3, Evans Decl., ¶¶ 6-8; Exh. 6, Stacy Decl., ¶ 4; Exh. 7, Pltf. Depo. at 49:6-8, 62:8-13); and plaintiff admittedly had some performance issues, initially failing to understand how to prioritize the delivery of business mail, testifying that some aspects of his

job were "difficult," and explaining how he got lost delivering a piece of express mail. (*Id*. at 15, citing Exh. 7, Pltf. Depo. at 27:2-16, 22:17, 23:11, 39:12-41:10).[8]

Plaintiff counters that defendant's reasons for his termination are pretextual. (Doc. 64). Plaintiff alleges that defendant did not evaluate his performance based on objective criteria but instead considered subjective factors such as his inability to focus, grasp the need for timeliness, and use the arrow key for delivery. (*Id*. at 26). Plaintiff also contends that defendant failed to comply with policies requiring that he receive a formal review as a CCA employed for at least 30 days, and that defendant did not cooperate in the EEO process by providing all of the information it believed to be important to the USPS's defense. (*Id*. at 26-27). In addition, plaintiff challenges several statements made by his supervisors as false, and he contends that Evans improperly relied on Witt's statement without properly investigating it. Plaintiff also alleges that Evans gave conflicting instructions and she gave shifting justifications as to why the clothing he wore one day violated work rules. (Doc. 64 at 27). Further, plaintiff appears to allege that defendant gave shifting justifications for his termination by changing the PS Form 50, Notification of Personnel Action, to reflect that the reason for his separation from employment was a voluntary resignation instead of a termination.[9] (*Id*. at 31-33).

Under the law of the Sixth Circuit, a plaintiff can establish pretext by showing: "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate

---

[8] Defendant also alleges that plaintiff testified he felt "some of his duties were 'impossible'," but this is a mischaracterization of plaintiff's testimony. (Doc. 52 at 15, citing Exh. 7, Pltf. Depo. at 23:11). Plaintiff testified that is was "impossible" to perform a single function.

[9] In the motion for summary judgment, defendant construes plaintiff's allegations related to the PS Form 50 as a separate cause of action under Title VII, and defendant argues that plaintiff has not produced evidence to support a prima facie case of discrimination based on alleged clerical errors in the processing of the form. (Doc. 52 at 19). It does not appear that plaintiff is bringing a separate cause of action based on an error in the PS Form 50, and the Court therefore need not address defendant's argument.

the employer's action, or (3) that they were insufficient to motivate the employer's action."

*Chen,* 580 F.3d at 400. The Sixth Circuit has explained that:

> Pretext can be established by (1) a direct evidentiary showing that a discriminatory reason more likely motivated the employer or by (2) an indirect evidentiary showing that the employer's explanation is not credible. However, mere conjecture that the employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment. To avoid summary judgment, the plaintiff is required to produce evidence that the employer's proffered reasons were factually untrue. Despite the shifting burdens of production, the ultimate burden of persuasion remains at all times with the plaintiff.

*Lindsay v. Yates,* 578 F.3d 407, 421 (6th Cir. 2009) (quoting *Peters v. Lincoln Elec. Co.,* 285 F.3d 456, 470 (6th Cir. 2002) (citations and quotation marks omitted)). The Sixth Circuit has cautioned that the courts should "avoid formalism" in the application of the three-part test, "lest one lose the forest for the trees." *Adkison v. Procter & Gamble Co.,* No. 1:10-cv-85, 2011 WL 6371084, at *12 (S.D. Ohio Dec. 19, 2011) (quoting *Chen,* 580 F.3d at 400, n.4). "Pretext is a 'commonsense inquiry' and at the summary judgment stage Plaintiff need only produce evidence from which the jury could reasonably doubt the employer's explanation." *Id.* (quoting *Chen,* 580 F.3d at 400, n.4).

Generally, where the defendant articulates multiple nondiscriminatory reasons for the adverse action, the plaintiff cannot prevail on summary judgment by showing that one of these reasons is pretextual. *Jones v. St. Jude Med. S.C., Inc.,* 504 F. App'x 473, 480 (6th Cir. 2012) (despite potential questions of material fact as to one articulated reason, the other independent, legitimate, nondiscriminatory reason stood); *Rufo v. Dave & Busters, Inc.,* No. 06-3111, 2007 WL 247891, at *4 (6th Cir. Jan. 31, 2007) (finding of a genuine issue of material fact as to whether one asserted reason (poor judgment) was pretextual did not warrant reversing the district court's judgment where the plaintiff failed to offer any evidence of pretext as to second reason

(poor performance)); *Choices in Community Living, Inc. v. Petkus*, 517 F. App'x 501, 507 (6th Cir. 2013) (quoting *Idemudia v. J.P. Morgan Chase*, 434 F. App'x 495, 505 n.7 (6th Cir. 2011) ("When a defendant presents multiple legitimate, nondiscriminatory reasons for the [adverse] action, . . . the plaintiff must demonstrate that each independently sufficient reason is a pretext for illegal discrimination.") (citing *Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1998)).

Conversely, the plaintiff can establish his burden by discrediting one of multiple proffered reasons for the adverse action if doing so "creates substantial doubt as to the . . . explanation and reasons for the adverse action." *Nathan v. Ohio State U.*, 984 F. Supp.2d 789, 801 (S.D. Ohio 2013) (Smith, J.), *aff'd*, 577 F. App'x 544 (6th Cir. 2014) (citing *Smith v. Good Samaritan Hosp.*, No. 1:06-cv-207, 2007 WL 1974952 (S.D. Ohio July 3, 2007) (Barrett, J.); *May v. Pilot Travel Centers*, No. 2:05-cv-918, 2007 WL 108001, *6 (S.D. Ohio Jan. 5, 2007) (Frost, J.)). There are cases where "the factfinder's rejection of some of the defendant's proffered reasons may impede the employer's credibility seriously enough so that a factfinder may rationally disbelieve the remaining proffered reasons, even if no evidence undermining those remaining rationales in particular is available." *Id.* at 802 (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764, n.7 (3d Cir. 1994)). Under this scenario, the plaintiff may not be required to discredit every reason articulated by the defendant. *Id.* at 801. The issue is one of quality, not quantity. *Id.* at 802. The question for the Court to determine is whether "the plaintiff has presented sufficient evidence from which a factfinder could conclude that the defendant's explanation is false, and that discrimination was the real reason." *Id.* at 802 (citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 512, n.4 (1993)).

Shifting and inconsistent reasons offered by an employer in the course of a lawsuit for an adverse action can create an inference of pretext. *Choices in Community Living, Inc.*, 517 F.

App'x at 508 (*citing Tuttle v. Metro. Gov't of Nashville,* 474 F.3d 307, 319-20 (6th Cir. 2007) (employer's rationale changed three times during suit); *Cicero v. Borg Warner Automotive, Inc.,* 280 F.3d 579, 592 (6th Cir. 2002) (same)). The lack of contemporaneous evidence to support a justification that was not proffered until after the decision to terminate the employee was made can likewise constitute evidence of pretext. *Cicero,* 280 F.3d at 591-92 (the plaintiff offered evidence showing that employer's proffered reason for firing him (poor performance) was false because employer offered no contemporaneous evidence that the plaintiff's failures caused it concern and raised no serious complaints about his performance until after it fired the plaintiff, instead praising his work and awarding him performance-based bonuses); *Choices in Community Living, Inc.,* 517 F. App'x at 508. However, it has been found that the plaintiff did not establish pretext where the evidence showed he was informed of the reasons for his termination at the time of discharge and the employer discussed those reasons during the plaintiff's employment. *Marter v. JE Johnson Contracting, Inc.,* No. 09-11661, 2010 WL 1753978, at *12 (E.D. Mich. Apr. 30, 2010).

In *Marter,* the Court distinguished *Cicero* on its facts because the plaintiff was informed he was being discharged based on his performance; the plaintiff acknowledged his employer had spoken with him about his performance; the defendant had consistently explained that the plaintiff was discharged based on his job performance; and although the plaintiff disputed whether certain problems should have been attributed to his performance rather than to the defendant company's management and structure, there was no question that the defendant had consistently held the plaintiff responsible for those problems. *Id.* Thus, although the plaintiff had been advised at the time of his termination only that his "performance" was the reason for his termination, it was necessary to view the response in light of prior discussions about the

plaintiff's performance and subsequent deposition testimony and affidavits which provided specific examples and details. *Id.* In light of all the evidence, the Court found that the plaintiff had not proffered sufficient evidence to show the defendant's proffered reason was pretextual. *Id.*

As in *Marter*, plaintiff Kiwewa has not produced or cited evidence to refute defendant's articulated reasons for his termination: i.e., plaintiff had issues with job performance as a CCA, and he refused to follow supervisors' instructions on several occasions. These are the same reasons defendant gave for plaintiff's termination at the time of his discharge. The Notice of Separation dated December 24, 2013, informed plaintiff that the USPS was discharging him due to his "continued performance issues and [his] failure to follow Postal Service Rules and Regulations. . . ." (Doc. 52, Exh. 4).

Further, there is no dispute that defendant contemporaneously documented the problems plaintiff had performing the CCA job during the probationary period. Stacy laid out plaintiff's performance issues in two emails, one of which he sent on December 13, 2013, prior to plaintiff's termination, and the second which he sent to Evans shortly after plaintiff's termination on December 27, 2013. (*Id.*, Exh. 12). In the first email, Stacy explained he and another individual had spent time trying to help plaintiff and assist him in improving his time, but plaintiff did not seem to be grasping his job duties. (*Id.*). In the second email, Stacy described in great detail his observations of plaintiff on December 13, 2013, which he had referenced in the earlier email; the problems he had noted and discussed with plaintiff; the expectations for plaintiff which he had discussed with him; and plaintiff's inability to grasp the need to be timely and to focus. (*Id.*). Plaintiff testified at his deposition that he was aware during his employment of Stacy's concerns about his performance. Plaintiff testified that Stacy thought plaintiff was

unable to perform his job, he was slow, he could not handle the mail, and he could not use the arrow key to open the mail, and plaintiff testified that Stacy put him on the same route to see if he could improve his performance. (Doc. 52, Pltf. Depo., Exh. 7 at 48:23-49:8). Evans confirmed the reasons originally provided for plaintiff's termination during the EEO inquiry and in her declaration submitted in this case, stating that plaintiff had continued performance issues and he disregarded his supervisors' direct instructions. (Doc. 52, Exh. 3, Evans Decl.; Exh. 5, Evans EEO Aff.).

As evidence of pretext, plaintiff suggests that Evans gave shifting versions of an alleged rule violation by initially asserting that plaintiff wore street clothes to work one day and then specifying in an interrogatory answer that the actual violation was improper footwear. (Doc. 64 at 27; *see* Doc. 59 at 4, citing Exh. E, Interr. # 23). Plaintiff has not shown that Evans contradicted herself or changed her reasons. In his interrogatories, plaintiff asked defendant to explain why Evans asserted in "testimony" that he violated rules and regulations by wearing street clothes. (*Id.*). Defendant objected to the interrogatory but answered that plaintiff reported to work wearing improper footwear, which was a safety hazard for him. (*Id.*). Elaborating on Evans' reason in this manner is not indicative of pretext.

Plaintiff points to "derogatory remarks" allegedly made by Stacy to raise questions about Stacy's motives. (Doc. 64 at 7). To determine whether discriminatory comments are circumstantial evidence of discrimination in a given case, the Court considers factors such as the "identity of the speaker, the nature and substance of the comments, and the temporal proximity of the comments to the challenged decision." *Griffin v. Finkbeiner*, 689 F.3d 584, 595 (6th Cir. 2012) (citing *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 354-57 (6th Cir. 1998)). Applying those factors here, the remarks plaintiff relies on are not probative of whether

plaintiff's performance issues were a pretext for national origin discrimination. Plaintiff first cites an alleged derogatory remark Stacy made when plaintiff worked under his supervision at the Sharonville Branch. (Doc. 64 at 7). Plaintiff alleges that Stacy told his supervisor that he could not "afford 15 people" to help plaintiff, but Stacy falsely stated during the EEO inquiry that he actually said, "I can't afford 15 hours on a route." (*Id.*; *see* Doc. 52, Exh. 9 at 4). Stacy explained during the EEO inquiry that plaintiff had worked at his office on two occasions and both times he had to send out four to five employees to finish delivering plaintiff's route.[10] (*Id.*). Stacy's comment referring to the need to enlist additional help for plaintiff does not call into question whether plaintiff was terminated because he had performance issues and is not evidence of a discriminatory animus.

Plaintiff also points to the statement in the DRS report about a perceived "cultural gap" as evidence of pretext. The DRS report provides: "Stacy states that he believes [plaintiff] tried to perform his duties to the best of his ability; however, he was slow and it appears to be a cultural gap as well as written and verbal barriers for the [plaintiff]." (Doc. 52, Exh. 9 at 4). For many of the same reasons discussed *supra* in connection with the direct evidence analysis, Stacy's comments are not sufficient to establish pretext. It is not clear whether Stacy referred to a "cultural gap" or whether this was the DRS's characterization of his comments. Assuming Stacy stated there was a "cultural gap," his comment is vague and is not overtly discriminatory. Further, there is no indication that Stacy participated in the termination decision other than to provide feedback to Evans on plaintiff's job performance. In addition, Stacy made the remark in March 2014, three months after plaintiff had been terminated. The "cultural gap" comment

---

[10] In his declaration, Stacy asserts that plaintiff worked at the Sharonville Branch four times. (Doc. 52, Exh. 6, Stacy Decl.).

therefore could not have been communicated to Evans prior to plaintiff's termination. In light of these considerations, the alleged discriminatory remarks are not sufficient to create an inference of pretext.

Further, plaintiff has not produced evidence to cast doubt on Pieper and Witt's statements concerning the issues they had with plaintiff's job performance and failure to follow instructions. Those statements are consistent with Stacy's reports of plaintiff's performance issues. Pieper reported that plaintiff did not deliver a package, which plaintiff apparently does not dispute. Plaintiff challenges only the assertion that Pieper delivered the package himself at the end of the day, which has no bearing on whether plaintiff followed his supervisor's instruction in this instance. (Doc. 64 at 24). Witt's statement is dated December 30, 2013, less than one week after plaintiff's termination. Witt reported that after being given specific instructions in the morning, Witt had to repeat those instructions twice when plaintiff was out of the office before plaintiff agreed to comply. (Doc. 52, Exh. 14). Plaintiff does not challenge Witt's statement as untrue or claim that the incident reported by Witt did not happen. He indicates only that he does not recall this conversation with Witt. (Doc. 64 at 25).

The remaining evidence plaintiff cites to show pretext does not suffice to call into question the validity of defendant's articulated reasons for his termination. Plaintiff alleges that defendant's alleged failure to provide all material information to the EEO investigator (statements by Stacy, Witt and Pieper) demonstrates pretext. (Doc. 64 at 27). Plaintiff acknowledges that the statements - which are not favorable to his claim - were generated prior to the EEO inquiry. It is not clear how defendant's alleged failure to produce evidence that supports its position, and which plaintiff concedes had been generated prior to the EEO investigation, demonstrates pretext.

In a further attempt to demonstrate pretext, plaintiff alleges that defendant did not evaluate his job performance objectively or according to required procedures. (*Id*. at 26-27). Plaintiff alleges that defendant's reliance on subjective criteria in judging his job performance instead of "efficient[] use [of] objective criteria" was discriminatory. (*Id*. at 26). However, plaintiff has not produced evidence to show that defendant's criticisms were unfounded or based on standards that were not applied to other CCAs. Nor has he produced evidence to show that defendant was required to apply objective standards to evaluate his job performance. Evidence that defendant had the discretion under the terms of the collective bargaining agreement to terminate his employment during the probationary period for any reason not otherwise prohibited under the law indicates that defendant was not required to apply any specific criteria to judge plaintiff or any other probationary employee's performance. (Doc. 52, Exh. 3, Evans Decl., Att. A).

Plaintiff also alleges that defendant failed to follow required procedures mandating a formal evaluation at the end of his initial 30-day employment period and completion of a PS Form 1750. The employment manual, Handbook EL 312, Employment and Placement, requires a probationary employee's supervisor to discuss the employee's performance with him at the end of 30 days and at the end of 60 days and to initial PS Form 1750 to show the discussions occurred. (Doc. 59-1 at Page ID#: 1033, Handbook EL 312, Employment and Protection, § 584.52). The Handbook provides:

> Most deficiencies can be corrected with discussion, training, and counseling. Additional formal evaluations are made only when informal evaluations have not been successful and only after employees understand their deficiencies, and have had a reasonable opportunity to correct them. If these additional evaluations occur during an employee's probationary period, they are documented using PS Form 1750.

*Id.*, § 584.53. However, this provision does not address the situation involved here where defendant opts to terminate an employee at the end of the 30-day period. Thus, absent evidence that defendant treated plaintiff differently than other CCAs who were terminated during the probationary period by not formally evaluating him, or some other evidence indicating that defendant acted with a discriminatory motive, defendant's failure to conduct a formal evaluation and generate a PS Form 1750 does not create an inference of pretext.

Plaintiff further seeks to characterize apparent errors in the PS Form 50, Notification of Personnel Action, issued in his case as "shifting justifications" offered for his termination. (Doc. 64 at 27). The record shows that defendant issued the following PS Form 50s following plaintiff's termination:

1. January 03, 2014: Notification of Personnel which reactivated plaintiff's employment effective December 24, 2013 "to cancel separation made in error as per district." (Doc. 64, Att. 10, Page ID#: 1137).

2. January 8, 2014 Notification of Personnel Action which reassigned plaintiff to the "Cost Center" effective December 28, 2013. (*Id.*, Att. 11, Page ID#: 1138).

3. May 8, 2014 Notification of Personnel Action which corrected plaintiff's Social Security number effective April 9, 2014. (Doc. 59-1 at Page ID#: 1057).

On July 30, 2014, Amy Daugherty, Supervisor, Customer Service Support, Cincinnati Post Office, submitted an affidavit as part of the EEO inquiry stating that she sent a PS Form 50 change request via email to the "HRSSC Form 50 Team" that same date after realizing an error had been made. (Doc. 59-1 at Page ID#: 1024-26). The email advised the HRSSC Team that plaintiff was given a Notice of Separation dated December 24, 2013, but his PS Form 50 Notice

of Personnel Action indicated that he had voluntarily resigned. (*Id.* at Page ID#: 1040). Daugherty asked the Team to change the PS Form 50 to reflect that plaintiff was terminated for continued performance issues and failure to follow USPS rules and regulations and to show the effective date and last day in pay status was December 24, 2013. (*Id.*). There was further correspondence between Daugherty and the HRSSC Form 50 Team regarding Daughtery's request. (*Id.* at Page ID#: 1040-41). It is not clear if a PS Form 50 was ever issued to change the resignation back to a termination.

The evidence related to the PS Form 50 does not permit an inference that the form was changed from a termination to a resignation to cover up an unlawful motive for plaintiff's termination. The reasons for plaintiff's termination were documented in the Notice of Separation, which states that plaintiff was being terminated because of performance issues and for failure to follow USPS policies and procedures. (Doc. 52, Exh. 4). There is no indication that any individual involved in the termination decision was also involved in the generation of the PS Form 50s. Plaintiff has not introduced any evidence that suggests the subsequently issued PS Form 50s documenting the reason for the separation as a voluntary resignation and reassigning him are anything but mistakes, which defendant attempted to rectify once they were discovered. For these reasons, the errors in the PS Form 50s are not probative of pretext.[11]

Plaintiff has not proffered evidence to show that the nondiscriminatory reasons articulated by defendant for his termination are a pretext for discrimination. The evidence shows that defendant consistently documented plaintiff's performance issues and refusal to follow supervisors' instructions both during his employment and following his termination, and plaintiff

---

[11] Plaintiff alleges in his response to the motion for summary judgment that the new PS Form 50 termination action generated by defendant violates 18 U.S.C. § 1001, a criminal statute, and a litigation hold notice. (Doc. 64 at 33). Plaintiff cannot bring a criminal action against defendant, and his allegations are otherwise without merit.

was aware of defendant's concerns during his employment. The evidence produced by plaintiff

is not sufficient to call into question the legitimacy of defendant's articulated reasons. The Sixth

Circuit's analysis in *Nathan* applies equally to plaintiff's case:

> Plaintiff's allegations to the contrary, [defendant] has provided substantial
> evidence to support its proffered rationales for [plaintiff's] dismissal. [Plaintiff]
> has simply not identified any comparator, similarly situated in all relevant
> respects and engaged in acts of comparable seriousness, who was retained. *See
> Wright v. Murray Guard, Inc.*, 455 F.3d 702, 710 (6th Cir. 2006). Plaintiff
> attempts to pick apart [the] analysis by isolating each issue . . . and to argue that
> there were systematic problems that account for [his] poor performance or that
> others had performance issues or that [his] poor performance should be excused.
> But this misses the point. The question is not whether other employees also
> performed poorly in one or two areas, but whether taken altogether they
> performed equally as poorly as [plaintiff] and whether [his] conduct as a whole
> justified [his] dismissal. . . . Because [plaintiff] has not presented evidence from
> which a reasonable trier of fact could find that [defendant's] proffered
> nondiscriminatory reasons for [his] termination were pretextual, [his termination]
> claim fails.

*Nathan.*, 577 F. App'x at 546.

### F. Claim for unpaid wages

Plaintiff alleges in the amended complaint that defendant did not pay him for five days

that he had worked prior to his termination, whereas other CCAs were correctly paid. (Doc. 27

at 6-7). Defendant construes plaintiff's allegation as a discrimination claim that is a separate

cause of action from plaintiff's unlawful termination claim. (Doc. 52 at 17-19). Defendant

moves for summary judgment on the claim on the ground the pay error was a clerical error of a

temporary nature that it has since rectified, and plaintiff has proffered no evidence to show

discrimination led to the error. Defendant further asserts that it learned after plaintiff filed this

lawsuit that he had not been paid for five days and that it relied on plaintiff's account of the

hours he worked on those five days to calculate the compensation owed. (*Id.* at 17). Defendant

contends that plaintiff received an adjustment check for the missing hours on January 6, 2017. (*Id.* at 18, citing Exh. 18).

In his response to the motion for summary judgment, plaintiff indicates that he is bringing a claim for unpaid wages under Title VII.[12] (Doc. 64 at 28-29). Plaintiff alleges that defendant delayed paying him all the wages that were owed him. Plaintiff asserts that defendant owed him wages for 80 hours of work when he was terminated on December 24, 2013. (Doc. 64 at 28, citing Doc. 64-2, Pltf. Aff., ¶ h). Plaintiff alleges he received an advance of $370.50 for 40 hours of training and orientation on January 3, 2014. (*Id.* at 28). Plaintiff alleges he did not receive the remaining amount owed until August 2014. (*Id.*). Plaintiff alleges he received a check on January 6, 2017 with unexplained tax cuts and a deduction in the amount of $107.29 for USPS retirement which does not appear on his 2016 W2 form. (*Id.* at 29, citing Doc. 59-1 at Page ID#: 1051).

The evidence shows that plaintiff was paid $370.50 for 40 hours of work on December 31, 2013, via a money order as an adjustment of wages owed. (Doc. 52, Exh. 20, Declaration of Laurie Benson, Supervisor of Payroll Services for USPS, ¶ 3; Atts. A, B). The adjustment for the missing wages was processed in early 2013 and plaintiff received a check in the amount of $123.74 on January 17, 2014, for the total amount of the adjustment, less federal and state taxes withheld, Social Security and Medicare deductions, and recoupment of the money order in the amount of $370.50. (*Id.*, ¶¶ 4, 5; Atts. C, D). Plaintiff received another payment of $391.40 by check dated December 30, 2016 for 38.47 hours of work. (Doc. 59-1 at Page ID#: 1052). The

---

[12] Plaintiff adds the following verbiage at the end of his argument related to unpaid wages: "Violation of wages and hours laws under the Fair Labor Standards Act [FLSA] and Deviation the procedure." (Doc. 64 at 29). To the extent plaintiff suggests he is also bringing a claim for unpaid wages under the FLSA, he is not entitled to pursue such a claim. Plaintiff did not present an FLSA claim in the amended complaint, and he has not alleged how defendant violated the Act.

pay stub shows that the gross pay amount was $588.59 and the net pay came to $391.40 after deductions for state and federal taxes, Medicare and Social Security deductions, and $107.39 for "Misc," (USPS Retirement).

There is no evidence in the record to show that plaintiff's wages were withheld or delayed based on a discriminatory motive. Plaintiff's vague allegation in the amended complaint that he was not paid correctly while other named CCAs were correctly paid falls far short of satisfying his burden to show he was treated less favorably than similarly situated employees with respect to the payment of wages. Plaintiff's allegations about errors in his pay do not support an inference that defendant acted with a discriminatory motive by failing to timely pay him all the wages he was owed or by not making the proper adjustments to plaintiff's pay once the errors were discovered. Insofar as the retirement deduction from the last check remains unexplained, there is no basis in the record for inferring that plaintiff's national origin is the reason for the unexplained deduction. Similarly, assuming the amounts that were withheld from the check should have been reported on plaintiff's 2016 W2 form but were not, the facts do not permit a finding that plaintiff's national origin is the reason for the omissions from the W2. Defendant is therefore entitled to summary judgment on plaintiff's claim for unpaid wages.

### G. Conclusion

Defendant has shown that there are no genuine issues of material fact on plaintiff's claims and that it is entitled to summary judgment in its favor as a matter of law.

**IT IS THEREFORE ORDERED THAT:**

1. Plaintiff's motion to amend/correct motion for partial summary judgment (Doc. 58) is **GRANTED** and plaintiff's original motion for partial summary judgment (Doc. 55) is **DENIED** as moot.

2. Plaintiff's "Request for Affidavit" under Fed. R. Civ. P. 56(e)(1), (2) (Doc. 57) is **DENIED**.

3. Plaintiff's motion for partial summary judgment under Fed. R. Civ. P. 56 (Doc. 59) is **DENIED**.

4. Defendant's motion for summary judgment under Fed. R. Civ. P. 56 (Doc. 52) is **GRANTED**. Judgment is **GRANTED** in favor of defendant on all claims and this case is **DISMISSED** from the Court's docket.

Date: 10/18/17

Karen L. Litkovitz
United States Magistrate Judge